### 8620

#### HORN v. CONWAY, COAST AND WESTERN R. R. CO.

RAILROADS—NEGLIGENCE—ISSUES.—Evidence to the effect that a pedestrian was walking along a path beside a railroad track where people were accustomed to walk without objection from the company in a populous manufacturing community while the plants were in operation, the noise of which drowned the noise of the engine, that he stepped on the track to avoid some railroad iron left in the path by the company, that he was struck by an engine running backwards as he stepped on the track, that no signals were given as the engine approached, carries the issues of negligence of the railroad company and of contributory negligence of the pedestrian to the jury.

Before G. W. RAGSDALE, special Judge, Horry, October term, 1912. Affirmed.

Action by N. E. Horn against Conway Coast and Western R. R. Co. Defendant appeals.

*Messrs C. P. Quattlebaum, L. B. Singleton* and *F. L. Willcox,* for appellant.

*Mr. Willcox* cites: *Duty of one about to cross a railroad track:* 94 S. C. 143. *Respective rights of railroad company*

*and one claiming the right to go upon its track:* 67 S. C. 499; 61 S. C. 556.

*Mr. H. H. Woodward,* contra, cites: *Whether plaintiff was licensee was for jury:* 86 S. C. 394, 301; 76 S. C. 378; 72 S. C. 393.

July 19, 1913.　The opinion of the Court was delivered by

Mr. Chief Justice Gary.　This is an action for damages, alleged to have been sustained by the plaintiff, through the wrongful acts of the defendant.

The allegations of the complaint, material to the questions involved, are as follows:

(1) "That for a distance of about one mile from its depot at Conway, towards Myrtle Beach, the railroad of the defendant runs parallel with, and near to, the Waccamaw River, and very close to large factories and lumber plants, employing large numbers of hands, and having tenant houses along, and almost immediately adjoining, the defendant's said track and right of way; that a large and remunerative freight business is transacted by defendant with and by means of said factories and plants; that impassable swamps and creeks are close to this portion of defendant's track on both sides, and especially on the side away from the said river, and the said track and right of way of the defendant is the only practicable and convenient way in which pedestrians may reach said factories and plants, and the houses along said track, or to pass between the said town of Conway and a section of the country lying between that point and Myrtle Beach; that for a long number of years past the employees of the said factories and plants, and the public generally, have been using daily the portion of defendant's track and right of way above referred to, for the purpose of going to and returning from their work, or business, at the said plants

and factories, and in passing through to and from other points in said county, all of which has been not only with the full knowledge of the defendant, its agents, servants and employees, but with its and their encouragement, consent and invitation, and acquiescence; that this portion of defendant's track and right of way passes through a very populous section, where people are constantly passing, and were passing at the dates hereinafter mentioned, and for a long number of years before, and ever since said date, the defendant allowing the public to use a footway on each side of its track throughout the portion of its track and right of way above mentioned, with its full knowledge, consent and acquiescence, and without any warning, protest or notice of any kind on its part.

(2) "That some noise is produced at all times along the said way, by means of the machinery and operations in said factories and plants, sufficient to confuse pedestrians, as to the ordinary noise of an approaching train, unless the whistle is blown or the bell is rung, to give warning of the approach of defendant's train, which fact was well known to the defendant, its servants, agents and employees, but was not so well known to the plaintiff, at the time of his injury hereinafter stated.

(3) "That on the early morning of the 13th day of July, A. D. 1911, while the plaintiff was passing along the defendant's track and right of way, near the said factories and plants, on his way from Conway to one of them, the defendant wilfully, recklessly, wantonly and in a grossly negligent manner, and without regard to the rights of humanity, without blowing the whistle or ringing the bell, and without giving any notice or warning of its approach whatever, in open daylight, in plain view of plaintiff for a half mile or more, without keeping any lookout, ran a train of flat cars, attached to a locomotive, backwards, up behind the plaintiff, at a great rate of speed, and hit the plaintiff with said cars a severe and terrible blow in the

back and legs, whereby he was thrown from the path, and sustained very painful, agonizing and permanent injuries."

The defendant denied all the allegations of the complaint, except its corporate existence, and set up the defense of contributory negligence on the part of the plaintiff.

At the concluison of all the testimony, the defendant's attorneys made a motion for the direction of a verdict, on the ground that there was no testimony tending to show negligence on the part of the defendant; and, on the further ground, that the plaintiff was guilty of contributory negligence.

His Honor, the presiding Judge, granted the motion, as to the cause of action for punitive damages, but refused it as to the cause of action for actual damages.

The jury rendered a verdict in favor of the plaintiff for seven hundred dollars, and the defendant appealed.

The exceptions raise, practically, but two questions, to wit: Was there any testimony tending to sustain the allegations of negligence? And, did the testimony show that the plaintiff was guilty of contributory negligence?

N. E. Horn, the plaintiff, testified as follows: "When did that accident occur that is mentioned in the complaint? July 13th, 1811. Describe how it happened? I was walking on the sidewalk on the side of the railroad, which is a very plain path on each side of the track, and was going along there— What caused the plain path? Where people walked frequently. State how it happened to you? I was going along and right against the mill— Was it pretty near opposite this plant? Yes, sir; pretty near opposite, and I heard somebody hollering, and I turned my head and saw the train, and as I turned my head and saw it, it struck me. I didn't have time to step or move any way. How long before they hollered did you turn? I turned as quick as I could, and it struck me on my right hip. Now, was that engine exhausting; did you hear it exhaust? No, sir; I think it was running very easily. Why? I think

it was a little down grade. Did you hear it blow? No, sir; it didn't blow; if it had blown I would have heard it. Did it ring the bell? No, sir. Was that plant in operation? Yes, sir. How much noise did that make? It would make right smart noise, but not enough to drown the noise of a whistle or bell, close to you. Now, Mr. Horn, explain what kind of use the public made, if any, of that track there? How long have you known that place? I have known it about four years; I have known it longer than that, but I have not been passing along on it, to know the public used it, only something like three or four years. State how frequently the public used it? I worked at the Conway Lumber Company, I reckon something like three years ago or four, and boarded over there at the old Kanawha plant. Is that another plant on the railroad? Yes, sir; it comes to the railroad. How far from this plant where you were injured? It is something like a half or three-quarters of a mile. I boarded with Mr. Grainger, and in passing I would see lots of people I didn't know; every day in passing, I would see people traveling the road. Did they travel it every day? Yes, sir; some days I would see as high as twenty-five walking along the road, and other days I would see them passing. Did the hands of these plants use it? Yes; they used it frequently. Did they use it every day? Yes; the hands that worked over here at the wood product mill used it every day, twice a day, going and coming. Was there any notice or protest made as to the use of that part of the track? No, sir; only at the bridge. There was a notice at the bridge? Yes, sir; this: 'This bridge is no thoroughfare. Keep off, danger.' That is the bridge at Conway? Yes, sir. Could anybody see you from Conway? If you were standing on the bridge at Conway and looking towards the place where you were injured, could they see you on the track? Yes, sir. Did the train come up behind you? Yes, sir. What other ways are there to go, or come from that

direction, from those plants? Do people live in the section of the county over there? Yes, sir; some live over there and some live at the old Kanawha plant, and some at the Red Hill. Do the farmers over there use that track in passing into town? Yes, those at Red Hill do. Frequently? Yes, sir. What other way could they go? No other except by going around by the ferry above there. A long way out of the way? Yes, sir; I suppose three or four miles out of the way. How about a boat on the river? They could come down the river on a boat. Did the railroad do any business with these plants? Yes, sir; they haul lightwood for them. Was there any obstruction in that path; how did you happen to step upon the track? There was some iron lying down here. Explain how that came about? There was some iron lying down there, and to keep from walking on the iron, I stepped upon the ties to get by. The train had changed schedule; the last account I had of it it had been going over there in the afternoon, and I was not expecting the train. You say there was a pile of railroad iron? Yes, sir; where they had tore up the old track and put heavy iron down. Could you pass on the off side of it? Yes, there was nothing over there. Could you have passed on the off side of the iron? Next to the ditch? Yes. Not very well; it was grown up in bushes; and I would have had to go down in the edge of the ditch. Can you hear well? Yes, sir. You are not hard at hearing? No, sir."

W. H. Crisp, a witness for the plaintiff, thus testified: "Were you working at a place where you could see to Conway? Yes, sir. What did you see? I saw him step up on the end of the ties, about the time the engine came to him. Did it strike him about the time he stepped up there? Yes, sir. Did that accident happen immediately opposite that plant? About twelve or fifteen feet south of the 'hog.' What did he step upon the track for? I don't know. Was there anything to show what he did it for?

I didn't see it. He had plenty of room between the ties and the railroad; about eighteen inches, if not more than that, between the end of the ties and the railroad iron, where they had taken it out and thrown it to one side. Just as the engine got opposite the chemical works, Mr. Horn, who, up to that time, had been walking on the path on the south side, stepped up on the track? Yes, sir. How far did that engine stop from Mr. Horn? Not over an engine length. Was the 'hog' running on this occasion? Yes, sir. Isn't it a fact that the 'hog' makes considerable noise when it is in operation? Yes, sir."

P. H. Sasser, the conductor on the train when the plaintiff was injured, testified in behalf of the defendant, as follows: "Where were you on that occasion? I was sitting in the cab of the engine, on the fireman's seat. How was that engine equipped as to a pilot? It had a pilot on both ends, one on the tender, and one at the front. How far could your engine be seen from the point, that Mr. Horn was first observed by you? Three-quarters of a mile. What was the first you saw of Mr. Horn that morning? I saw him walking by the side of the track. How far was the Kanawha plant beyond the point where Mr. Horn was struck? Probably half a mile or three-quarters. About how fast was this train running? Eight or ten miles an hour, or it might not have been that fast. After getting the signal, we stopped probably in the length of the engine, or a little further than that. Were there any cars in front of the engine as it was then running? No, sir; nothing but an engine; we were handling a light engine. What was the first notice you had that Mr. Horn had got up on the track? I saw the signal of the fireman and flagman; they threw their hands up and hollered, 'Stop!' How far did it take to stop the engine? I don't think the engine went over twice its length. Were there any obstructions there, such as would, in your opinion, lead a reasonable man to suppose that one walking along there was going to cross

without any warning? No, sir; just a string of rails. The track had been relaid and the rails were stretched out all along there. Is it or not a fact that this pathway is used for the convenience of the people who happen to live in that section, or have work over there, and not by the public at large? I guess so; some of the public people may use it."

Cross-examination.

"Didn't you frequently see people on the track where Mr. Horn was hurt? Yes; and always looking out for them. Did you ring the bell or let him know you were coming with an engine? There was nothing to ring the bell for; there was no obstruction on the track. You remember the iron at the track where he was injured; you knew it was there? Yes; I knew it was there. You didn't blow the whistle? If he had been on the track I would have blown the whistle. You saw him walking on the side of the track? Yes, sir."

Redirect examination.

"Was it only at this point where Mr. Horn stepped up on the track that the iron was lying? No, sir; the iron was all the way on the ground there."

The Court: "How far were you from him when you first saw him? I saw him two or three hundred yards of us, and then I saw him about fifty yards, and when I saw him he was about four feet clear from the track."

Henry Baldwin, the engineer, testified as follows: "Were you running at any more than your customary speed? We were running slower than anywhere else. Were you running as you usually do on that road? Yes, sir; always take precautions along there. Was there anything to obstruct Mr. Horn from being seen? Nothing in the world. Had you seen him at all? I had seen people down the road, as is an everyday occurrence, about that plant. They are working along by the track, and sometimes people walk ahead of you on the road, and they turn out before you

get to them. I saw people in the road before I left Conway. How far were you from where Mr. Horn was struck before you stopped? When I stopped the engine and jumped off, the back pilot of the engine was just a little past him. From the time the word was given me, I think I stopped the engine in its length and a half. I know I skidded the drivers."

George Clark, the flagman, thus testified: "What was the first you saw of Mr. Horn? On the side of the track, walking along. Was there anything unusual, to see people walking along there? No, sir. When did you first see that Mr. Horn was going into a place of danger? Just about eight or ten feet before we got to him, he stepped right up on the track. What did you do when he did that? I threw up my hand and signed the engineer down and hollered."

The facts in *Sanders* v. *Ry.,* 90 S. C. 331, were very similar to those in the present case. In that case there was testimony to the effect that the plaintiff was injured while walking in a well beaten path along side of defendant's track, at a place where the public had been accustomed to walk for many years, without objection on the part of the railway company; that the train which struck him was running backwards, at a rate of from twelve to twenty miles an hour, through a populous section of the city of Charleston, where men, women and children were constantly passing and repassing, upon defendant's right of way, and upon and near its tracks; that the train ran upon him from behind, without giving any signal or warning of its approach.

In that case the Court said: "We think this testimony made out a *prima facie* case for plaintiff. From it the jury *might* reasonably have inferred that the use of its right of way by the public was known to and acquiesced in by the defendant, and, therefore, that plaintiff was a licensee, and entitled to ordinary care on the part of defendant, to pre-

vent injury to him; and, also from the frequency of the use by the general public, that defendant should have anticipated the presence of persons on or near its track at that place, and should have exercised due care to prevent injury to them. * * * We think his Honor erred, also, in holding that plaintiff was guilty of negligence in walking too close to the track, where there was room enough for him to walk, at a safe distance from it. The testimony was, that he was walking in a well defined path. From this the jury might have inferred that the path had been used by many people before, and that in walking where many others had gone before, plaintiff was exercising ordinary care. In Lamb's case the Court said: 'In the cases cited (that is the Jones case and the cases following it) it was entirely consistent with reason to say that it was not negligence *per se* for a person to walk on the right of way expecting to step off on the approach of a train.' "

Even a cursory glance at the foregoing testimony will show clearly that the present is a much stronger case than that of *Sanders* v. *Ry.*, 90 S. C. 331.

I do not deem it necessary to cite other authorities to show that there was negligence on the part of the defendant, and that the issue as to contributory negligence was properly submitted to the jury.

Judgment affirmed.

Mr. Justice Hydrick *concurs.*

Mr. Justice Fraser *concurs in the result.*

Mr. Justice Watts *dissents.* This was an action for damages alleged to have resulted from personal injuries sustained by plaintiff-respondent by reason of being struck by a train of defendant-appellant company, on July 13, 1911. The case was tried before special Judge G. W. Ragsdale and a jury at October term, 1912, and resulted

in a verdict for $700 in favor of plaintiff.   After entry of judgment appellant appeals and asks reversal by six exceptions.

The first exception complains of error in not directing a verdict for the defendant on the ground that all of the testimony tends to show that the injuries to the plaintiff resulted not from any negligence upon the part of the railroad company, but by reason of plaintiff's own negligence. That according to all of the testimony, including that of the plaintiff, plaintiff stepped on the railroad track immediately in front of a moving train without looking or listening or taking any other precaution to ascertain whether or not the train was approaching, being at that time surrounded by noise, which prevented his hearing the approach of the train, and for these reasons his injuries were solely due to his own negligence.

The second exception complains of error in not directing a verdict on the ground that even if it is conceded that the defendant was negligent the proof of contributory negligence on the part of the plaintiff was so complete that only one conclusion could be arrived at, to wit: the plaintiff's contributory negligence was the proximate cause of his injury, without which such injury would not have resulted. It appears from the record that his Honor, in refusing to direct a verdict for defendant, directed the jury that there was no testimony in the case from which wilfulness might be inferred.

We think these exceptions should be sustained, and that his Honor was in error in not directing a verdict for the defendant-appellant.   The evidence shows that the appellant operated a railroad, a portion of which extends from Conway across Waccamaw River in the direction of the Atlantic Ocean, to Myrtle Beach.   Respondent was injured by locomotive of appellant about half a mile from Conway. Near the point at which he was injured there was a plant known as the wood products plant.   Between one-half to

three-fourths of a mile beyond the wood products plant, traveling from Conway, was the Kanawha lumber plant. The railroad tracks between Conway and the point at which plaintiff was injured, crosses a drawbridge over Wacca-maw River, and another long trestle. At each of these trestles was a sign maintained by the railroad, warning people not to use the trestle. Plaintiff lived about two miles from Conway, on the opposite side of the river from the place where he was injured, and on this occasion was traveling in the direction of Kanawha plant. He knew that the trains run over this track four times a day. On this occasion he used the trestles in defiance of the warning on the sign boards not to use them. It does not appear in evidence what object he had in view, or what business he was on in traveling towards the Kanawha plant at the time of his injury. The evidence shows that the railroad track was perfectly straight from Conway to the point at which he was injured, and if he had looked he could have seen the locomotive at any point between Conway and that point. The injury was received between eight and ten o'clock in the daytime. The injury was received almost opposite the wood products plant, where the machinery made con-siderable noise in running while grinding up lightwood. The evidence shows at the time of the injury the locomotive, by which plaintiff was injured, was equipped with a pilot at each end, left Conway between eight and nine o'clock in the morning, on schedule time, as a regular scheduled train, in the direction of Myrtle Beach, that the day was clear. That the engineer was at his regular post, and conductor was in the cab of the engine, on the fireman's seat. That the fireman and flagman were sitting on tender at the front end of the locomotive, as it was running, for the purpose of looking out, according to the rules. The locomotive was running at a slow rate of speed, owing to the fact that a good many people were working around the wood products plant, where there was considerable noise. When the loco-

motive, by which plaintiff was injured, left Conway, plaintiff was walking in the direction of Myrtle Beach, on the right of way of railroad, on the south side of the track, and had he remained here would not have been injured. If he had looked at all, immediately before he stepped on the track, there was nothing to prevent his seeing the locomotive approaching. But being on the right of way, and not on the railroad track when the locomotive had about reached him he stepped up on the track immediately in front of it, about twelve or fifteen feet south of the "hog" then being operated at the wood products plant. As he stepped on the railroad track the brakeman and fireman gave the alarm, which was heard by a bystander at some distance, but failed to attract plaintiff's attention. Plaintiff failed to heed the warning when given, and having failed to exercise ordinary care or precaution for his safety, he was struck and knocked in the ditch alongside the track. The evidence shows there was plenty of room between the ties piled on the right of way, and the track for him to walk without getting on the track. The evidence shows conclusively to my mind that the plaintiff's injury was due solely to his own carelessness and negligence in not exercising the slightest degree of care or taking any precaution for his safety. He had crossed two trestles in defiance of notice, that no one was permitted to do so. He was not going from one town to another town, he was not attempting to go from one public road to another public road. The place was not a populous community, but on the contrary, does not seem to have been settled at all, or any one living on the railroad. There was absolutely not a jot, or tittle of evidence. to support the assumption that the right of way and railroad track of the defendant at the location in question, had been dedicated to the public use and that the plaintiff, or any one else, had acquired the license to so use it. The undisputed evidence in this case shows. that the defendant exercised more than ordinary good care at the place of

injury, the track was clear. There was no obstruction in the view. The train was running at a moderate speed. The evidence shows that the conductor and the engineer were looking out, two employees in addition to this were stationed in front of the locomotive, as it was then running, and these two gave at the first opportunity ample warning of his danger. The plaintiff, on the contrary, neglected to look or exercise any care and precaution whatsover to avoid the danger. By looking he could have seen the locomotive, by listening he could have heard the moving of the locomotive, or warning given by the two employees of the defendant. The evidence shows that he did not even exercise slight care. He was not traveling at such a place as Mrs. Jones was in the case of *Jones* v. *Ry. Co.*, 61 S. C. 556, 39 S. E. 758. Nor does the case of *Carter* v. *Railway*, 93 S. C. 329, fit this case. In the Jones case the allegation and proof showed she lived in a populous section of Anderson, and she was injured at a place where the general public had been accustomed to walk for many years, and where men, women, and children had been accustomed to walk. In the Carter case the evidence showed that the public generally, for over twenty years, had walked the railroad between two small towns, and that the deceased was deaf and dumb. There is no proof in this case of any infirmity on the part of the plaintiff, either as to hearing or seeing. There was no proof in this case sufficient to show that the public had acquired by uninterrupted use for the statutory period and there was no evidence at all that any one had used the track previously for a crossing, at the point where plaintiff got on the railroad track and was injured. As was said by this Court in the case of *Cable Piano Company* v. *Southern Railway Co.*, 94 S. C. 143: "The law imposes upon every capable person the duty of observing due care for his own safety when about to cross the railroad track, which necessarily involves the exercise of his senses. And while it is ordinarily a question of fact for the jury to say

whether under the circumstances of the particular case the traveler did exercise such care, when the facts are undisputed and susceptible of only inference, it becomes a question of law for the Court." *Zeigler* v. *R. R.,* 5 S. C. 221; *Edwards* v. *Ry.,* 63 S. C. 271, 41 S. E. 458; *Bamberg* v. *Railway,* 72 S. C. 389, 51 S. E. 988; *Osteen* v. *Ry.,* 76 S. C. 378, 57 S. E. 196; *Drawdy* v. *Ry.,* 78 S. C. 379, 58 S. E. 980; *Griskell* v. *Ry.,* 81 S. C. 193, 62 S. E. 205. In the case at bar the plaintiff was injured, not at a public crossing, as was the case in Cable Piano Company, *supra,* but on a railroad track, not at a public crossing, but by his stepping on the track in front of an approaching locomotive, without exercising the slightest care for his protection by the exercise of his senses. By the exercise of his sense of sight, or hearing, the injury would have been prevented. The plaintiff did not look or listen for the train before stepping on the track. He failed to observe its approach; he disregarded the warnings of the employees in the engine, and the only inference that can be drawn from the evidence is that his own negligence was the sole cause of his injury. There is no proof that the injury was in any manner due to any actionable negligence on the part of the defendant railroad. The railroad company, as the evidence shows, did its full duty; it kept a reasonable lookout. It gave warning of the approaching of the train and observed ordinary care under the circumstances of the case to avoid injury to the plaintiff.

"One going on or near a railroad track is bound at his peril to make diligent use of his senses of sight and hearing, in order to detect the approach of trains, and a disregard of such duty, and a stepping on the track, without looking or listening, would be negligence, and if plaintiff had reason to believe that trains would be approaching, the fact that he was an employee did not release him from the necessity of exercising reasonable care, under the circumstances for his own safety, and that he had no right to rely wholly on

the railroad company to protect him from passing trains."
*Illinois Cent. R. Co.* v. *Nelson,* Federal Reporter, May 29,
1913, page 957.

In my view of the case the judgment should be reversed,
and complaint dismissed, as motion to direct for defendant
should have been allowed, and it is unnecessary to consider
the other exceptions, and for this reason I dissent.